# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# CEDAR RAPIDS DIVISION

TINA M. RICHMOND,

        Plaintiff,

vs.

JO ANNE B. BARNHART,
COMMISSIONER OF SOCIAL
SECURITY,

        Defendant.

No. C-05-48-LRR

**ORDER**

_____

## *TABLE OF CONTENTS*

*I.*     *INTRODUCTION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*II.*    *PRIOR PROCEEDINGS* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*III.*   *PRINCIPLES OF REVIEW* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*IV.*   *THE AGENCY DECISION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

       *A.*     *Step 1 of the Sequential Evaluation Process* . . . . . . . . . . . . . . . . . . 5

       *B.*     *Step 2 of the Sequential Evaluation Process* . . . . . . . . . . . . . . . . . . 6

             *1.*     *Physical Health* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

             *2.*     *Mental Health* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

             *3.*     *The ALJ's Step 2 Findings* . . . . . . . . . . . . . . . . . . . . . . . . 8

       *C.*     *Remaining Steps of the Sequential Evaluation Process* . . . . . . . . . . 8

*V.*     *JUDICIAL REVIEW* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*VI.*   *CONCLUSION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

## I. INTRODUCTION

Tina Richmond seeks judicial review of the Social Security Commissioner's decision to deny her application for Title XVI supplemental security income ("SSI") benefits. Richmond asks the court to reverse and order the Commissioner to provide her SSI benefits. Finding no error in the Commissioner's decision, the court shall affirm.

## II. PRIOR PROCEEDINGS

On November 8, 2001, Tina Richmond protectively filed an application for SSI benefits. On December 4, 2001, Richmond filed a formal application. Richmond claimed that she suffered from a disability, which began on May 1, 2000. Specifically, Richmond alleged that she had asthma, emotional problems, stomach problems, arthritis and heart problems. Richmond maintained that frequent vomiting limited her ability to work.

On May 28, 2002, the Social Security Administration ("SSA") denied Richmond's application for SSI benefits. The SSA determined that Richmond was not disabled because her conditions were not severe enough to keep her from working. The SSA noted that Richmond was able to go shopping, babysit five children, drive a car and occasionally go fishing. The SSA found that many of Richmond's afflictions were treatable with medication and that her vomiting would subside if she stopped drinking alcohol.

On June 20, 2002, Richmond filed a request for reconsideration. On January 17, 2003, the SSA reconsidered Richmond's case and concluded its initial determination was correct. Consequently, the SSA again denied Richmond's claim.

On March 14, 2003, Richmond requested a hearing before an Administrative Law Judge ("ALJ"). On February 26, 2004, the ALJ, Lauren R. Mathon, held a hearing. On August 13, 2004, the ALJ determined that Richmond was not disabled and was not entitled to SSI benefits.

On October 5, 2004, Richmond requested a review of the ALJ's decision.

Richmond contended that the ALJ's written ruling contained "several false and out of context statements." Richmond also alleged that her health had deteriorated and, therefore, she needed more time to submit evidence on her behalf. On January 14, 2005, the SSA Appeals Council denied Richmond's request for review. Consequently, the ALJ's decision stands as the Commissioner's final decision.

On March 10, 2005, Richmond filed a Complaint in this court and sought judicial review of the Commissioner's decision. Proceeding pro se,[1] Richmond attached a letter to her Complaint. In such letter, Richmond challenged the ALJ's factual findings on a number of grounds. On May 27, 2005, the Commissioner filed an Answer.

On June 30, 2005, Richmond filed a one-page "brief" to "inform the Courts [sic] of [her] intentions." Richmond stated that she is "trying to receive [m]edical compensation . . . [and] if possible financial assistance." Richmond indicated that in May and June 2005 she was admitted to the hospital for heart and asthma complications. She stated that heart problems, self-mutilation, severe asthma, a "mental heath [sic] issue," "Degenerative Disk Decease" [sic], arthritis and "possible diabetes" are presently making it difficult for her to keep a job.

On August 29, 2005, the Commissioner filed a Resistance. The Commissioner contends there is substantial evidence to support the Commissioner's decision to deny Richmond SSI benefits, and, therefore, the court should affirm such decision.

### III. PRINCIPLES OF REVIEW

Title 42, United States Code, Section 1383(c)(3) provides that the Commissioner's final determination after a hearing not to award SSI benefits is subject to judicial review

---

[1] Richmond has chosen to proceed pro se throughout these proceedings. At the February 26, 2004 hearing, the ALJ informed Richmond of the availability of counsel, but Richmond declined to hire an attorney.

3

to the same extent as provided in 42 U.S.C. § 405(g). 42 U.S.C. § 1383(c)(3). "The court shall have the power to enter . . . a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ." *Id.*

The court must consider "whether the ALJ's decision is supported by substantial evidence on the record as a whole." *Vester v. Barnhart*, 416 F.3d 886, 889 (8th Cir. 2005) (citing *Harris v. Barnhart*, 356 F.3d 926, 928 (8th Cir. 2004)). The court must not re-weigh the evidence, but rather simply inquire as to whether "a reasonable person would find [the evidence] adequate to support the ALJ's determination." *Id.* (citing *Sultan v. Barnhart*, 368 F.3d 857, 862 (8th Cir. 2004) and *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005)). The court must not only consider the evidence in the record that supports the Commissioner's determination, but also any evidence that detracts from it. *Draper v. Barnhart*, 425 F.3d 1127, 1130 (8th Cir. 2005). While inaccuracies and unresolved conflicts of evidence can serve as a basis for remand, "'deficiency in opinion-writing is not a sufficient reason to set aside an ALJ's finding where the deficiency [has] no practical effect on the outcome of the case . . . .'" *Id.* (quoting *Reeder v. Apfel*, 214 F.3d 984, 988 (8th Cir. 2000)).

## IV. THE AGENCY DECISION

To determine if Richmond was entitled to SSI benefits, the ALJ analyzed whether Richmond was "disabled" under 42 U.S.C. § 1382c. The ALJ applied the following five-step "sequential evaluation process" set forth in the federal regulations:

> (i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled. . . .

4

> (ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment . . . or a combination of impairments that is severe . . . we will find that you are not disabled. . . .
>
> (iii) At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s) that meets or equals one of our listings in appendix 1 to subpart P of part 404 of this chapter and meets the duration requirement, we will find that you are disabled. . . .
>
> (iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled. . . .
>
> (v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled. . . .

20 C.F.R. § 416.920(a)(4) (2001); *see, e.g., Vester*, 416 F.3d at 888 (reviewing ALJ's application of same five-step sequential evaluation process).

### *A. Step 1 of the Sequential Evaluation Process*

In the first step, the ALJ analyzed whether Richmond was engaged in "substantial gainful activity" during the time that she sought benefits, i.e., May 1, 2001 to the time of the ALJ's ruling in 2004. The federal regulations define substantial gainful activity as gainful "work activity that involves doing significant physical or mental activities . . . even if it is done on a part-time basis . . . ." 20 C.F.R. § 416.972(a).

The ALJ found that Richmond was not engaged in substantial gainful activity from May 1, 2001 to May 31, 2003, but found that she was engaged in substantial gainful activity from June 1, 2003, through August 13, 2004, the date of the filing of the order. At the time of the hearing, Richmond was working twenty to thirty hours per week as a packager at a local newspaper. She started her job on June 1, 2003. Richmond earned between $8.25 and $8.65 per hour; her take-home pay was approximately $600-$758 per month. The ALJ found this work constituted "substantial gainful activity" and, thus, concluded Richmond was not "disabled" between June 1, 2003, and August 13, 2004.

### B. *Step 2 of the Sequential Evaluation Process*

Because there was no evidence Richmond was engaged in substantial gainful activity from May 1, 2001, to May 31, 2003, the ALJ turned to the second step in the analysis for this time period. That is, the ALJ analyzed whether Richmond had a severe mental or physical impairment at any time between May 1, 2001, and May 31, 2003. In her written ruling, the ALJ reviewed the following evidence, which is based upon testimony and exhibits presented at the hearing:

#### 1. *Physical Health*

Richmond was a 39 year old female, was 64 inches tall and weighed 164 pounds. She has a history of Hepatitis C.

In December 2001, Richmond was experiencing vomiting associated with nausea. She was drinking up to a six-pack of beer per day, down from a twelve-pack per day. A physician conducted an upper gastroinstestinal endoscopy and noted superficial erosions in Richmond's gastric antrum. Biopsies revealed chemical gastritis. A colonoscopy was negative. Richmond was anicteric and acyanotic. Her cardiac rhythm and rate were regular. A gastroenterologist recommended that Richmond stop using alcohol due to her symptoms and Hepatitis C, but Richmond persisted.

Richmond was asthmatic and occasionally wheezed. She used inhalers for her asthma. Richmond smoked three to five cigarettes per day.

In February 2002, a doctor conducted a disability evaluation. Richmond told the doctor that she could not work due to bile leaking into her stomach and vomiting after meals "zero to seven" times a day. Richmond's lungs were clear except for rhonchi in the right upper lobe and slight tenderness in the epigastric area. Deep tendon reflexes were symmetrical. She had normal station and gait. Richmond could squat and walk on her toes and heels. Her muscle strength was 5/5 throughout. Richmond's pulse was eighty beats per minute and regular.

The doctor noted no functional limitations. Richmond asserted that she could lift and carry twenty pounds in an eight-hour workday. She could stand, walk and sit for eight hours a day. She could stoop four to six hours per day, climb two to three hours per day and kneel two hours per day. Richmond had no difficulties with handling objects, seeing, hearing, speaking or traveling. On account of her asthma, Richmond had environmental restrictions with regard to fumes and high temperatures.

In February 2002, Richmond was still drinking alcohol. In July 2002, Richmond was told again to stop her alcohol use due to chronic Hepatitis C.

In August 2002, Richmond complained that she had left shoulder pain with radiation to her left arm and hand. X-rays of her cervical spine showed mild to moderate degenerative disease at the C5, C6 and C7 vertebrae. Richmond told her neurosurgeon that she was doing reasonably well and was not interested in surgery. A liver biopsy showed very mild chronic inflammation with no evidence of fibrosis and some macrovesicular steatosis.

In early October 2002, Richmond was still drinking. By the end of the month, she was sober. Richmond continued to smoke. Otherwise, Richmond was doing well. Her

Hepatitis C was stable.

### 2. Mental Health

From April 2000 to October 2002, Richmond received psychiatric treatment for depression, drug and alcohol dependence, antisocial personality disorder and borderline personality disorder. She responded "well." By August 2002, Richmond was doing "fairly well." By October 2002, she was doing "relatively well." Although it was recommended that she continue treatment, Richmond stopped participating.

In April 2002, a mental health disability evaluation was conducted. Richmond was diagnosed with major depressive disorder, polysubstance dependence (by history) and borderline personality disorder not otherwise specified with antisocial and schizoid personality traits. A doctor opined that Richmond was able to remember and understand simple and routine instructions, make decisions with direct supervision and respond appropriately to minor changes in a work setting. Richmond was able to care for herself. She had a driver's license and drove daily.

In May 2002 and January 2003, a state agency medical consultant confirmed much of the doctor's findings. The consultant also opined that Richmond was capable of activities that do not require attention to detail, sustained vigilance or extensive contact with the general public or coworkers.

### 3. The ALJ's Step 2 Findings

Based on the foregoing medical evidence, the ALJ determined that Richmond had the following "severe" impairments from November 8, 2001, to May 31, 2003: depression, borderline personality disorder, asthma, Hepatitis C, back pain and tachycardia.

## C. Remaining Steps of the Sequential Evaluation Process

In spite of Richmond's "severe" impairments, the ALJ found that Richmond was

not under a "disability" from November 8, 2001, to May 31, 2003. The ALJ came to this conclusion for two independent reasons. First, in the third step of the analysis, the ALJ held that Richmond's impairments, while "severe," were "not 'severe' enough to meet or medically equal, either singly or in combination to one of the impairments listed in Appendix 1, Subpart P, Regulations No. 4." Second, in the fourth step in the analysis, the ALJ found that Richmond retained a residual functional capacity ("RFC") to perform light work, i.e., work that requires maximum lifting of twenty pounds and frequent lifting of ten pounds. Based in part on the testimony of a vocational expert, the ALJ found that Richmond could return to her past relevant work as a telemarketer and a prep cook. In other words, Richmond's past relevant work did not require the performance of work-related activities outside of her RFC.

The ALJ found Richmond could occasionally climb, kneel and crawl, and she could frequently balance, stoop and crouch. Richmond could understand, carry out and remember simple instructions, respond appropriately to supervision, coworkers and usual work situations, and could deal with changes in a routine work setting.

The ALJ found that Richmond's allegations concerning the severity of her limitations were "not totally credible." Assessing the record, the ALJ wrote:

> Regarding her daily activities, [Richmond] has described those activities as not quite limiting to the extent one would expect, given her complaints of disabling symptoms and limitations. She is capable of cleaning house, washing dishes and shopping with her boyfriend. She is also able to work . . . at a local newspaper for 20-30 hours a week. [Richmond] testified that in 2003, she traveled to Arkansas (a 13 hour drive) for 3-4 days, without any significant problems noted upon traveling. Further, [Richmond's mother testified at the hearing] that [Richmond] was "doing quite well" [and such testimony] did not support [Richmond's] allegations as to the severity of her medical problems and limitations.

9

The ALJ also noted that the record indicated "a long history of alcohol abuse" despite "numerous recommendations to stop her intake of alcohol due to her problems." The ALJ also found that Richmond "received adequate treatment for her complaints."

Accordingly, the ALJ determined that Richmond did not have a "disability" between either November 8, 2001, and May 31, 2003, or between June 1, 2003, and August 13, 2004. The ALJ, thus, did not need to undertake the fifth step of the analysis.

## V. JUDICIAL REVIEW

In her Complaint, Richmond draws the court's attention to a number of alleged errors in the ALJ's written decision. The court shall discuss each of these allegations in turn.[2]

First, Richmond contends the ALJ named the wrong doctor and mischaracterized her statements to that doctor. The ALJ noted that, on August 22, 2002, "Dr Hitchon (neurosurgeon) indicated that claimant was doing reasonably well and was not interested in pursuing surgical intervention at that time." Richmond argues (1) she saw Dr. Van and a resident, not Dr. Hitchon, and (2) she never said she did not want surgery.

There is substantial evidence to support the ALJ's findings. The record contains a letter indicating that Richmond had an appointment with Patrick W. Hitchon, M.D., on August 22, 2002, in Iowa City. In the letter, Dr. Hitchon wrote that Richmond "is doing reasonably well and is not yet ready for surgical intervention. [She] is not interested in pursuing surgery at this point either."

Second, Richmond contends that the report is erroneous in that the ALJ "talks about

---

[2] In light of Richmond's pro se status, the court shall liberally construe her pleadings and incorporate the allegations in her Complaint into her brief. *See, e.g., Haines v. Kerner*, 404 U.S. 519, 520-21 (1972).

me being on parole in October of 2002. That is false for I was completely off parole on September 8, 2002." The ALJ's discussion was as follows:

> [Richmond] received psychiatric treatment from April 2000 to October 2002 at the Abbe Center for depression, drug and alcohol dependence, antisocial personality disorder and borderline personality disorder. She responded well to treatment and therapy (Exhibit 4F). By August 2002, claimant was doing fairly well (Exhibit 9F/4). By October 2002, she was still doing relatively well (Exhibit 9F/2). Although it was recommended that she continue with treatment, she stopped participating, apparently when it was no longer required by her parole officer (Exhibit 9F).

There is substantial evidence in the record to support the ALJ's findings. The Outpatient Coordinator at the Abbe Center noted in her "closing summary" dated May 29, 2001, that Richmond was referred to the Abbe Center by her parole officer. The Outpatient Coordinator also noted that "[f]urther treatment was recommended but client did not follow through." Dr. Lon Olsen, a state agency consultant, concluded in May 2002 that Richmond was discharged from the Abbe Center "apparently when it was no longer required by her parole officer."

Third, Richmond argues that the ALJ wrongly found that she saw a state agency medical consultant in January 2003. The ALJ simply noted that the state agency consultant *rendered an opinion* in January 2003. Nowhere did the ALJ indicate the state agency consultant *saw* Richmond. The record discloses that Dr. Dee Wright gave her opinion on Richmond's condition on January 12, 2003. It is clear that Dr. Wright did not interview Richmond; Dr. Wright repeatedly referred to "the evidence in the file" to support her conclusions.

Fourth, Richmond argues that the ALJ took her mother's testimony out of context. The ALJ noted in the decision that Richmond's mother testified at the hearing that

Richmond was "doing quite well." Richmond argues that, in context, it is clear her mother did not mean to say that Richmond was doing well in all aspects of her health, but instead was only referring to Richmond's recent progress in her "self-mutilation and self-harm issues."

It is clear from the record that the ALJ did not take the testimony from Richmond's mother out of context. Richmond's mother was not testifying about Richmond's self-mutilation. Instead, Richmond's mother was responding to the ALJ's questions about Richmond's liver and stomach problems. Plaintiff's mother testified "right now, I think she's doing quite well." It appears Richmond has confused her mother's testimony with her sister's. The ALJ questioned Richmond's sister about Richmond's self-mutilation at the hearing; Richmond's sister testified that she "thought [Richmond] was doing just excellent" but did not know about Richmond's claims of recent self-mutilation. The record supports the ALJ's conclusion that Richmond's mother testified that Richmond was "doing quite well."

Fifth, Richmond complains that "[t]here is no mention by the Judge of my cutting on myself ever being discussed anywhere in the Judges [sic] Decision letter." There is limited medical documentation of self-mutilation in the record in conjunction with Richmond's depression. Richmond and her sister, Kathy "Katia" Richmond, briefly testified at the hearing that Richmond cut herself in the past when depressed. Richmond testified that she cuts herself "anytime I feel under pressure. . . . [I]t makes me feel better."

The court concludes Richmond's fifth objection also lacks merit. "Although required to develop the record fully and fairly, an ALJ is not required to discuss every piece of evidence submitted." *Black v. Apfel*, 143 F.3d 383, 386 (8th Cir. 1998). "An ALJ's failure to cite specific evidence does not indicate that such evidence was not

considered." *Id.* "'There is no bright line test for determining when the Commissioner has failed to develop the record.'" *Gregg v. Barnhart*, 354 F.3d 710, 712 (8th Cir. 2003) (quoting *Battles v. Shalala*, 36 F.3d 43, 44 (8th Cir. 1994)). "'The determination in each case must be made on a case by case basis.'" *Id.* Reviewing the record as a whole, it is clear that the alleged self-mutilation was part-and-parcel of Richmond's depression. Richmond's depression was addressed in the ruling. The ALJ explicitly noted that the regulations required her to consider all of Richmond's symptoms, *see* 20 C.F.R. § 416.929, and immediately thereafter she found that Richmond's own allegations about the severity of her ailments were "not totally credible." One of these allegations was self-mutilation. The ALJ also found at the hearing that the self-mutilation "doesn't seem to affect your ability to work part-time." There is also little medical evidence in the record concerning Richmond's self-mutilation. For these reasons, the court concludes it is "'highly unlikely that the ALJ did not consider and reject'" Richmond's allegations of self-mutilation. *Craig v. Apfel*, 212 F.3d 433, 436 (8th Cir. 2000) (quoting *Black*, 143 F.3d at 386).

Sixth, Richmond takes issue with the ALJ's determination that her work activity since June 1, 2003, constitutes "substantial gainful activity" within the meaning of the federal regulations. Richmond contends that she has not been able to engage in substantial gainful activity for any continuous period of at least twelve months.

There is substantial evidence in the record to support the ALJ's finding that Richmond engaged in substantial gainful activity between June 1, 2003, and August 13, 2004. The federal regulations define substantial gainful activity as gainful "work activity that involves doing significant physical or mental activities . . . even if it is done on a part-time basis . . . ." 20 C.F.R. § 416.972(a). The ALJ found that Richmond was working twenty to thirty hours a week as a packager at a local newspaper at the time of the hearing,

and had been working in such a capacity since June 1, 2003—a period of over fourteen months. Richmond earned between $8.25 and $8.65 per hour; her take home pay was approximately $600-$758 per month. There is, thus, substantial evidence in the record to support the ALJ's findings and the ALJ correctly concluded that Richmond was not "disabled" from June 1, 2003 to August 13, 2004.

Richmond's remaining complaints concern health problems that she has allegedly suffered after the ALJ filed the written decision in August of 2004. Richmond claims that she had surgery on her neck on January 3, 2005, had cadaver bones put in her spine and "do[es] not go a day without a good deal of pain" in her left upper arm and shoulder. In her brief, Richmond indicates that she was admitted to the hospital on multiple occasions and suffers from a number of "health issues."

Richmond does not present any evidence to support her claims. Her Complaint and brief simply point out that she wants SSI benefits and suffers from a number of "health issues" since the ALJ's decision. Lacking any evidence to support her claims, the court declines to consider them. In any event, this is not the proper forum to make such new allegations. An SSI application remains pending from the date it is filed until the date of the hearing decision. 20 C.F.R. § 416.330. If a claimant "meets all the requirements for eligibility after the period for which [the] application was in effect, [the claimant] must file a new application for benefits." *Id.* § 416.330(b); *see also Nelson v. Sullivan*, 966 F.2d 363, 365 n.2 (8th Cir. 1992) ("To be eligible for [SSI] benefits . . . , a claimant must show he was under a continuing disability *while his application was pending.*" (emphasis added)). If Richmond believes that her condition has deteriorated since the date of the hearing decision and such condition warrants SSI benefits, she must file a new application.

Having considered the record and Richmond's claims, the court concludes that the Commissioner's decision to deny Richmond benefits is supported by substantial evidence.

Accordingly, the court shall dismiss Richmond's Complaint with prejudice.

## VI. CONCLUSION

(1) The final decision of the Commissioner of Social Security is **AFFIRMED**;

(2) Plaintiff's Complaint (docket no. 4) is **DISMISSED** with prejudice; and

(3) The Clerk of Court is directed to enter judgment accordingly.

**IT IS SO ORDERED.**

**DATED** this 6th day of January, 2006.

LINDA R. READE
JUDGE, U. S. DISTRICT COURT
NORTHERN DISTRICT OF IOWA